UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 15-cr-237(1) (MJD/BRT)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S MEMORANDUM IN** |
| vs. | ) | **SUPPORT OF PRETRIAL RELEASE** |
| | ) | |
| USAMA DARWICH HAMADE, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Defendant Usama Hamade submits this memorandum in support of his pretrial release. The Court was correct in ruling that this matter is governed by 18 U.S.C. § 3142(f)(2), such that a detention hearing is only appropriate in the first instance upon a showing of (1) a serious flight risk, or (2) a serious risk the defendant will attempt to obstruct justice or interfere with a prospective witness or juror. The government's proffer did not result in such a showing, and this Court should release Mr. Hamade without conditions on this basis.

In the event such a showing was made, however, Mr. Hamade should be released nonetheless, as there are conditions available that will assure community safety and mitigate any flight risk. Those conditions include home-detention release to a halfway house, coupled with electronic, GPS-style monitoring. Under such strictures, Mr. Hamade will be largely confined to a halfway house, yet will still be able to participate in the preparation of his defense in a meaningful way that is not available if he is incarcerated.

1

## BACKGROUND

*Procedural Background*

On August 19, 2015, Usama Hamade was charged by indictment with one count of Illegal-Export Conspiracy, in violation of 18 U.S.C. § 371. (Doc 1.) Mr. Hamade, a Lebanese and South African citizen, had never been to the United States (let alone the District of Minnesota), but was alleged to have worked with others to export drone parts to Lebanon without procuring appropriate licensure or authorization. (*Id.*)

For the next two years, nothing happened with this case. Mr. Hamade was not arrested, and apparently he was not approached by the United States government in any way, even though there was an active federal indictment pending against him. On June 6, 2017, the government filed a superseding indictment, adding an allegation that the parts referenced in the original indictment, as well as a pair of binoculars, were delivered to "Hizballah," a designated foreign terrorist organization. (Doc. 7.) Despite the new allegations, the only charged offense remained Illegal-Export Conspiracy, in violation of 18 U.S.C. § 371. (*Id.*) That charge carries a five-year statutory maximum penalty.

On October 11, 2017, the government filed yet another superseding indictment. (Doc. 22.) This Second Superseding Indictment, the operative document for this Court's analysis, added very little in terms of factual allegations against Mr. Hamade, but now charged that Mr. Hamade's delivery of the pair of binoculars referenced in the prior indictment amounted to smuggling in violation of 18 U.S.C. § 554. (*Id.* at 11-12.) Mr. Hamade was arrested in South Africa on February 13, 2018. (Doc. 35 at 2.) For approximately 20 months, Mr. Hamade was held in a South African jail pending

extradition. He made his initial appearance before this Court on October 18, 2019.

*The Detention Hearing*

On October 29, 2019, this Court held a hearing to determine whether Mr. Hamade and his brother Issam Hamade should be detained. Although the government previously indicated it would be presenting live testimony at the detention hearing (Doc. 49 at 15), and despite the availability of several witnesses who were present at the hearing, the government elected to proceed by proffer. It presented 14 exhibits, most of which were video or audio clips from January 30 and April 8, 2014 Skype calls between Mr. Hamade and an undercover government agent, accompanied by transcripts. Defendant Issam Hamade submitted 16 exhibits (identified at Defense Exhibits A-P), and Mr. Hamade submitted two additional exhibits (identified as Defense Exhibits 1-2). A transcript of the hearing has been filed. (Doc. 59.)

*Discovery Produced Post-Hearing*

Consistent with this Court's scheduling order (Doc. 45), on October 30, 2019 the government produced thousands of pages of discovery, as well as several video and audio recordings. Among the recordings are full versions of the January 30 and April 8, 2014 Skype video calls between Mr. Hamade and the government's undercover agent.[1] During these calls, the agent repeatedly attempts to bait Mr. Hamade into engaging in clandestine military procurement deals, only to have Mr. Hamade consistently redirect the agent to South African government officials to engage in legitimate business. Mr. Hamade also

---

[1] Short clips from these calls were proffered as Government Exhibits 1-4, 9-10.

refers to Chris Neveling, the government's star witness who claims justifiable fear of Mr. Hamade, as a "good guy" despite his theft. In discussing how Mr. Hamade handles matters when he is the victim of fraud or theft, he tells the agent that he either litigates or reaches out to appropriate authorities. Mr. Hamade submits the entirety of these calls as Defense Exhibits 3 (January 30, 2014 call) and 4A & B (April 8, 2014 call).[2] Discs of these calls and other exhibits will be provided to the parties and the Court with this filing.

Among the government's other disclosures is a transcript of calls between Mr. Neveling and Mr. Hamade, occurring in early 2015. These calls occurred years after Mr. Neveling stole over $38,000 from Mr. Hamade—the incident that the government claims contributed to Mr. Neveling's fear of Mr. Hamade so much that he has been in hiding ever since. These calls were apparently recorded once Mr. Neveling began working with the United States on this case, in order to try to surreptitiously extract incriminating information from Mr. Hamade. Yet, as the transcripts show, Mr. Hamade does not threaten Mr. Neveling either explicitly or implicitly. Rather, the two discuss this investigation in a cordial manner, and terminate their conversation. These transcripts are attached as Defense Exhibit 5.

Discovery also revealed that the government conducted an extensive investigation into the criminal history and background of both Usama Hamade and Chris Neveling. With respect to Mr. Neveling, the government knew as early as 2015 that Mr. Neveling had a

---

[2] The April 8, 2014 call was cut off for a short time before resuming, and thus is comprised of two separate recordings that are nearly continuous.

"Red Notice"[3] for illegal firearm possession and theft. This document is attached as Defense Exhibit 6. In contrast (and in contradistinction to the government's assertion that Mr. Hamade is a brutal murderer), the government learned that Mr. Hamade had no prior convictions, and that all three prior charges (2 old driving offenses and a 2007 charge for illegally pointing a firearm) had been withdrawn. These documents are attached as Defense Exhibit 7. No discovery supported the government's theory that Mr. Hamade murdered and dismembered his gardener.

## ANALYSIS

**I.   The Government Did Not Establish that Mr. Hamade Presents a Serious Flight Risk or Threat to Obstruct Justice.**

As the Court correctly noted at the detention hearing, Mr. Hamade is not charged with any of the offenses set forth in 18 U.S.C. § 3142(f)(1) which automatically entitle the government to a detention hearing. Rather, he is charged with two nonviolent offenses involving illegal exportation.[4] (Doc. 22.) As such, a detention hearing is only appropriate upon a showing that (1) there is a "serious risk" Mr. Hamade will flee; or (2) there is a "serious risk" that Mr. Hamade "will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective

---

[3] A "Red Notice" is an international wanted persons notice issued by INTERPOL. More information on Red Notices may be found at https://www.interpol.int/How-we-work/Notices/Red-Notices.

[4] The government maintains that the offense conduct is especially concerning because the exported goods were delivered to members of Hezbollah, an organization Mr. Hamade supports. (Doc. 49 at 2-10.) Providing material support to a designated foreign terrorist organization is its own crime, and one which is much more serious than the charged offense. *See* 18 U.S.C. § 2339B. Despite several indictments, Mr. Hamade is not charged with that offense.

witness or juror." 18 U.S.C. § 3142(f)(2)(A) & (B). These are threshold issues; absent some showing of a serious risk of flight or obstruction, there is no statutory basis for a detention hearing.

### A.    Mr. Hamade Does Not Present a Serious Risk of Flight.

The entirety of the government's argument that Mr. Hamade presents a serious risk of flight is encompassed in a single paragraph of its pre-hearing filing. (Doc. 49 at 14-15.) It suggests that Mr. Hamade must be detained in jail because he "has absolutely no ties whatsoever to any community in the United States." (*Id.* at 15; *see also* Det. Hr'g Tr. at 72-75 (with respect to Issam Hamade, asserting that lack of community ties demonstrated likelihood of flight)).

This Orwellian proposition—that the government can pluck a person away from their well-established home country only to later argue that the person has no ties where the government decides to deposit them—fails for several reasons. First, an analogous proposition has been rejected by this district and several circuit courts with respect to ICE detainers.[5] In *United States v. Barrera-Omana*, 638 F. Supp. 2d 1008 (D. Minn. 2009), the government argued that detention was appropriate due to a defendant's ICE detainer. Indeed, the government asserted the ICE detainer *required* detention, because otherwise there was a serious risk that the defendant would be deported and thus unavailable for their criminal proceeding. *Id.* at 1110-11. Judge Rosenbaum, in a seminal decision widely relied

---

[5] The government directly stated it is not relying on any ICE detainer as a basis for detention in this case. (Det. Hr'g Tr. at 70.) Nonetheless, courts' evaluation of ICE detainers in criminal detention settings provides a strong analytical framework for the government's flight-risk argument here.

upon by district and circuit courts, rejected this proposition. "The risk of nonappearance referenced in 18 U.S.C. § 3142 has to involve an element of volition." *Id.* at 1111. In other words, the government cannot create the conditions giving rise to the risk of nonappearance that it complains about. *Id*; *see also United States v. Ailon-Ailon*, 875 F.3d 1334, 1338-40 (10th Cir. 2017) (Bail Reform Act's reference of risk of nonappearance does not encompass involuntary risks); *United States v. Santos-Flores*, 794 F.3d 1088, 1092 (9th Cir. 2015) (same).

Although couched slightly differently than in the language of a detainer, the government's argument that Mr. Hamade is a flight risk distills down to precisely that: Mr. Hamade cannot be released because he is in the United States, where he has no ties. Just as in cases involving ICE detainers, the government may not simply advance its self-created conditions as legitimate bases to detain Mr. Hamade without more. And here, that is all there is.

Each other factor that may demonstrate a flight risk is missing. Mr. Hamade has no passport in his custody. He has no travel paperwork in his custody. He came to the United States in order to resolve this matter. As demonstrated in the bond report, he has a successful business, a strong background which includes years of military service, and a close-knit family. In contrast, there is no evidence of prior flight, evading authorities, or secreting himself, despite being aware of these charges for months before his arrest.[6] This

---

[6] Mr. Hamade proffers that in the fall of 2017, he was informed of the indictment against him. Mr. Hamade made a statement to this effect in an affidavit submitted during his extradition proceedings.

is particularly impactful because Mr. Hamade could have easily fled to Lebanon, which does not have an extradition treaty with the United States. He did not. Rather, he remained in South Africa where he was arrested and held pending these charges.

Finally, Mr. Hamade addresses the government's statement that "the risk of flight in a case like this has much higher consequences than in many others." (Det. Hr'g Tr. at 72.) This misses the mark. The question is not the import of hypothetical flight, but rather whether there is a serious risk of flight in the first place. There is not. Properly framed, the government has not met its burden.

**B.     The Government Has Not Shown a Serious Risk that Mr. Hamade Will Obstruct Justice.**

Absent a showing that Mr. Hamade presents a serious flight risk, the only other basis for granting a detention hearing is if the government could demonstrate "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). In neither its prehearing filing nor during its oral presentation did the government express an intent to rely on this section of the Bail Reform Act, yet Mr. Hamade addresses it briefly to ensure complete analysis.

There is nothing to suggest the government could show that Mr. Hamade is a serious risk to obstruct justice if released. The last overt act alleged in the Second Superseding Indictment occurred on December 3, 2013—nearly six years ago. The government's robust investigation resulted in thousands of pages of discovery and several media recordings. It defies logic to suggest that in late 2019 Mr. Hamade presents a "serious risk" of obstructing

justice in an investigation that appears to have been complete for years.

Presumably, the government will now assert that there is a serious risk Mr. Hamade will intimidate or threaten its star witness, Chris Neveling. While the matter of Mr. Neveling's credibility will be fully vetted at trial, this Court must at least consider the reliability of the statements the government has put before it. Mr. Neveling's February 21, 2018 affidavit claimed that Mr. Hamade graphically threatened Mr. Neveling and his family, eventually forcing Mr. Neveling to move to the United Kingdom to seek refuge in 2012, remaining away from his native South Africa ever since. (Gov't Ex. 13.) But, as demonstrated at the hearing on this matter, Mr. Neveling is also an admitted thief, who fled South Africa after stealing nearly $40,000 from Mr. Hamade. Shortly after this theft, Mr. Neveling's brother Steg revealed that Mr. Hamade was just the most recent victim of Mr. Neveling, who had "stolen from my parents, myself and my two sisters." (Def. Ex. 1.) Moreover, Mr. Neveling's suggestion that he lives in fear of Mr. Hamade is belied by evidence that he reached out to Mr. Hamade in early 2014 via Facebook Messenger[7] to discuss a newspaper article. (Def. Ex. 2.)

Consistent with defense counsel's suggestions regarding Mr. Neveling's relationship with Mr. Hamade, discovery produced by the government since this Court's October 29 hearing shows there is no serious risk of intimidation or threat. In early 2015, Mr. Neveling, then working with United States authorities, placed several recorded calls to

---

[7] In his affidavit, Mr. Neveling claimed that Mr. Hamade used Facebook Messenger to inform that he knew where Mr. Neveling lived in 2012. (Gov't Ex. 13 at ¶ 13.) No such message was produced at the hearing or, by undersigned counsel's review, in discovery.

Mr. Hamade. (Def. Ex. 5.) The purported purpose of the calls was for Mr. Neveling to alert Mr. Hamade to the instant investigation by United States authorities. During the calls, the two men discuss that subject, but Mr. Hamade expresses no ill will toward Mr. Neveling. There is no discussion of hurting or killing Mr. Neveling or his loved ones. Rather, almost in passing Mr. Hamade mentions the debt, but there is no direct or veiled threat to Mr. Neveling.

Likewise, the government has now produced the entire January 30 and April 8, 2014 Skype calls between Mr. Hamade and its undercover agent. The first of these is over 40 minutes long. As it relates to Mr. Neveling, the snippet of the call set forth at Government Exhibit 1 is not an accurate reflection of the entire conversation. During the call, Mr. Hamade expresses disgust about Mr. Neveling stealing tens of thousands of dollars from him. Mr. Hamade vents that he would have gladly provided Mr. Neveling with financial support upon request, but feels betrayed by money being stolen. In this lengthy, stream-of-consciousness call (which Mr. Hamade drinks and smokes throughout), Mr. Hamade also describes being the victim of theft from a United States exotic car company, and asks the undercover agent to contact someone at the FBI to assist. Mr. Hamade further explains that he is suing this other fraudster, underscoring to the undercover officer that he resorts to litigation (not strong arm tactics) or seeking help from authorities when he feels he has been wronged. *See generally* Def. Ex. 3.

The April 8, 2014 Skype call, which the government cut into several short clips (Gov't Exs. 3,4, 9, 10), is actually two consecutive calls totaling over 40 minutes long. This

10

call involves very brief discussion of Mr. Neveling.[8] That discussion includes Mr. Hamade saying that although he had recently spoken with Mr. Neveling, he did not save the phone number because "I'm not interested about him, I want my money back and that's it." (Def. Ex. 4A at 4:56-4:59.) If Mr. Hamade were truly seeking to terrorize Mr. Neveling in the manner the government intimates, he certainly would have retained a reliable means to communicate with Mr. Neveling. Yet when presented the opportunity, he did not. Later that night during the second call between Mr. Hamade and the undercover agent, Mr. Hamade described Mr. Neveling as "a good guy" and "a good person." (Def. Ex. 4B at 6:28-6:32, 7:14-7:17.)

Discovery has further revealed that Mr. Neveling had additional motivation to leave South Africa, beyond stealing from everyone who held him close. On October 5, 2015 the Department of Justice sent a Request for Assistance to the Central Authority of the Republic of South Africa, seeking information about Messrs. Hamade and Neveling. In this notice, the government revealed that since 2012 Mr. Neveling has had a "Red Notice" for theft of binoculars and illegal firearm possession. (Def. Ex. 6 at 4.) Mr. Neveling was not fleeing Mr. Hamade; he was fleeing his own prosecution.

While Mr. Hamade intends to provide a more fulsome presentation of Mr. Neveling's lack of credibility at trial, at this point in the proceedings it is at least clear that there is no "serious risk" that Mr. Hamade would threaten or intimidate Mr. Neveling. There is no such evidence with respect to any other prospective witness or juror, either. As

---

[8] During the calls, the parties spend a good deal of time trading war stories, showing off jewelry, talking about Facebook memes, and drinking strong Lebanese alcohol.

11

such, the government is not entitled to a detention hearing under § 3142(f)(2)(B).

## II. There are Conditions that Will Assure Mr. Hamade's Appearance and Community Safety.

In the event the Court determines that the government has demonstrated an entitlement to a detention hearing, that does not end matters. Next, the Court must determine the least restrictive conditions to impose that will assure community safety and mitigate any risk of flight. 18 U.S.C. § 3142(c)(1)(B). That analysis requires consideration of (1) the nature and circumstances of the charged offense(s); (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger posed by release. Mr. Hamade addresses each in turn below.

### A. The Nature and Circumstances of the Charged Offense.

Mr. Hamade is charged in a two-count indictment with Conspiracy, in violation of 18 U.S.C. § 371 (Count 1) and Aiding and Abetting Smuggling, in violation of 18 U.S.C §§ 554 and 2 (Count 2). He is not charged with the far-more-serious offense of Providing Material Support to a Terrorist Organization, in violation of 18 U.S.C. § 2339A, despite the government's refrain that Mr. Hamade's actions supported Hezbollah. (*See, e.g.,* Det. Hr'g Tr. at 18-19, 20-21.) Count 1 has a 5-year statutory maximum penalty; Count 2 has a 10-year statutory maximum penalty. Neither offense is within the broad category of crimes that trigger the Bail Reform Act's presumption of detention. 18 U.S.C. § 3142(e)(2). There is, rather, a presumption of release. 18 U.S.C. § 3142(f).

Mr. Hamade was indicted in 2015, charging acts that happened several years prior. Those acts still comprise the bulk of the Second Superseding Indictment, with the latest of

them occurring in December of 2013. Despite being indicted as early as 2015, Mr. Hamade was not arrested until 2018. While the government now complains that release could have severe consequences because Mr. Hamade might flee, it certainly did not treat this case with urgency in the years between Mr. Hamade's indictment and arrest.

**B.      The Weight of the Evidence.**

In spite of a wide-ranging, international investigation, the evidence against Mr. Hamade is weak. At the October 29, 2019 hearing, the government indicated that Mr. Neveling's affidavit (Gov't Ex. 13) "is the most direct evidence that we have right now." As discussed above, that evidence comes from the mouth of an admitted thief and international fugitive.

But it is not for lack of effort that the government has no other "direct evidence" of the charged offenses. In the Skype calls between Mr. Hamade and the government's undercover agent, the agent repeatedly tries to lure Mr. Hamade into engaging in black market purchases of military-use equipment, specifically mentioning the availability of drone parts. The agent, supposedly in Chicago, also repeatedly disowns the United States government's involvement, telling Mr. Hamade that he would be "in jail" if the government knew what he was doing. The agent makes it all too clear that he is offering military or paramilitary parts to Mr. Hamade to use for any purpose, in any application, and on behalf of anyone. (Def. Ex. 3 at 18:09-18:12 ("I've got all the contacts . . . I can move anything, anywhere.")) Yet, Mr. Hamade rejects the agent's advances, repeatedly telling him throughout their calls that any transaction would have to go through the government, not Mr. Hamade. (Def. Ex. 3 at 20:30; 189 at 14:20.) Mr. Hamade specifically told the agent

13

that while he was happy to act as a go-between to the government, he wanted to "do everything legal, nothing illegal," and that he wanted the government "involved" and to "know everything." (Def. Ex. 4A at 14:20). This is not merely neutral evidence; it will help to establish that Mr. Hamade is not guilty of the charged offenses. This is an important consideration when determining whether to further detain a person who has been incarcerated for nearly two years already.

**C.     Mr. Hamade's Personal History and Characteristics.**

In its briefing and oral presentation, the government sensationally announced that "[t]his is a case about Hezbollah," (Det. Hr'g Tr. at 16), that "the efforts in this case led generally to the abilities of the Shia militants to use drones" that recently attacked Saudi oil fields, (Det. Hr'g Tr. at 71), and that for his part Mr. Hamade is "a violent, gun-toting thug," (Doc. 49 at 12.) But marvel only goes so far, and in this case what is left beyond that falls far short of the standard to demonstrate either a flight risk or danger to the community.

With respect to the government's statement that this case is truly about Hezbollah, the assertion collapses under its own weight. That is so because it is *not* a case about Hezbollah at all; it is about Usama and Issam Hamade. Hezbollah, according to the government's expert Katherine Bauer, is a Shia Muslim organization.[9] Religion is not incidental to Hezbollah—the name itself literally translates to Party of God. For Muslims, their religion is one which forsakes alcohol and other mood altering chemicals, to the point

---

[9] The government cited Ms. Bauer's work during the October 29, 2019 hearing, and has provided Ms. Bauer's full affidavit to Mr. Hamade.

14

that many Muslims will not ingest common cooking products that include alcohol.

In Ms. Bauer's lengthy affidavit, she traces the history of Hezbollah, its international reach, its financial structure, and its procurement activities. She identifies numerous associates by name. Yet, despite presenting a 20-page, single-spaced affidavit written in 10 point font (with 97 footnotes, no less), nowhere is Usama Hamade mentioned. That is because he is not a member of Hezbollah or a supporter of the militant wing of the organization. The Court need not comb the record to uncover the fallacy of the government's argument here. Mr. Hamade cannot be both a drunkard and Hezbollah. Faced with significant evidence of Mr. Hamade's regular alcohol consumption, the government makes no attempt to harmonize this apparent inconsistency.

The government further asserted that, regardless of Hezbollah membership, Mr. Hamade is a dangerous person, highlighting Mr. Neveling's stunning claim that Mr. Hamade brutally murdered his gardener as punishment for theft. The government fails to disclose, though, that as part of its investigation it sought information about all previous records of arrest, charges, and convictions for Mr. Hamade. South African authorities responded that Mr. Hamade has no prior convictions, and that he had 3 prior cases registered against him (2 driving offenses and unlawfully pointing a firearm), but they had all been "withdrawn."[10] (Def. Ex. 7.) Nowhere is there mention of this supposed murder and mutilation, although, according to Mr. Neveling, Mr. Hamade brashly bragged about it to a group in his presence. To believe that Mr. Hamade murdered his gardener, yet there

---

[10] This information was provided in discovery on October 30, 2019.

15

was no conviction, no charge, not even an investigation, requires a level of nationalistic elitism that cannot be countenanced. Just as South Africa arrested Mr. Hamade for nonviolent driving offenses, one would reasonably expect the country to investigate and prosecute a murder.

At bottom, the Court is left with Mr. Hamade as described in the bond report: a successful businessman, a military veteran, and a loving father. The basis he had for carrying weapons in South Africa—protection for his wealth—is not present here.

## CONCLUSION

For the reasons stated in Section I, Mr. Hamade believes a detention hearing is not appropriate in his case and asks that he be released without conditions. In the event the Court disagrees, he respectfully submits that for the reasons set forth in Section II, there is a combination of conditions that will assure Mr. Hamade's appearance and assuage any safety concern. Those conditions include placement at a halfway house on home-detention status, GPS monitoring, and continued surrender of all travel documents, passports, and visas.

Dated: November 5, 2019　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　*s/Douglas Micko*
　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　DOUGLAS MICKO
　　　　　　　　　　　　　　　　　　　　Attorney ID No. 299364

　　　　　　　　　　　　　　　　　　　　MANNY K. ATWAL
　　　　　　　　　　　　　　　　　　　　Attorney ID No. 282029
　　　　　　　　　　　　　　　　　　　　Attorneys for Defendant
　　　　　　　　　　　　　　　　　　　　107 U.S. Courthouse
　　　　　　　　　　　　　　　　　　　　300 South Fourth Street
　　　　　　　　　　　　　　　　　　　　Minneapolis, MN 55415