UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-237 (JRT/BRT)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>(1) USAMA DARWICH HAMADE,<br><br>　　　　　Defendant. | POSITION REGARDING<br>SENTENCING |

The United States of America, through its undersigned attorneys, respectfully submits its Position Regarding Sentencing of defendant Usama Darwich Hamade.

## THE PRESENTENCE INVESTIGATION REPORT

The government has no objections to the factual statements in the Presentence Investigation Report ("PSR"). As well, the government has no objections to the guidelines calculations set out in the PSR. Thus, the total offense level is 23, and the defendant's guidelines range for imprisonment is 46 to 57 months.

## GOVERNMENT'S MOTIONS FOR UPWARD VARIANCE AND FOR AN EVIDENTIARY HEARING

The government makes two motions.

First, the government respectfully moves for a small upward variance to 60 months' imprisonment for this very serious supporter of Hizballah.

Second, the government respectfully moves for an evidentiary hearing to elucidate the history and characteristics of the man standing before it for sentencing, and the nature

and circumstances of the offense he committed against the United States, a years-long conspiracy to provide hundreds of thousands of dollars in military items to Hizballah.

The government strongly suggests that the Court conduct the sentencing and evidentiary hearings in a live courtroom. The government anticipates that its presentation at the sentencing hearing will be through the principal law enforcement officer who investigated this case, former FBI Special Agent Steven Warfield. SA Warfield's testimony on direct examination, should his testimony be taken in a live courtroom, will last approximately 2 hours, and will involve offering and publishing at least 20 exhibits, including some video evidence. The hearing would be extremely cumbersome and slow if conducted by Zoom. As well, cross-examination of SA Warfield would be far more efficient if conducted in a traditional setting. The government understands that the sentencing hearing may have to be moved to accommodate a live, in-court hearing, but the government believes that the Court, the government and the defendant will all benefit from a live, efficient presentation and cross-examination.

## OFFER OF PROOF

A.   The History and Characteristics of "Prince" Sam Hamade.

The government's investigation revealed that Hamade is a Lebanese national who permanently relocated to the Republic of South Africa ("RSA") in approximately 1996. Hamade's lifestyle in the RSA has been steeped in violent, remunerative criminality during the entire period of his residence in that country.

The government has interviewed four persons who interacted directly with Hamade in South Africa, and one person, Eric Hoover, a United States person who interacted with Hamade over the Internet. One of these persons, Chris Neveling, a citizen of the RSA, directly assisted Hamade in procuring items for Hizballah from the United States and other countries. Neveling has provided extensive information about what it was like to work closely with Hamade during the period from approximately August 2009 through October 2011. In addition, the government has interviewed another former business associate of Hamade, Madelein O'Callaghan, and her son, Renier O'Callaghan, both RSA citizens, about their interactions with Hamade. Finally, the government interviewed Gaynor Neveling, Chris Neveling's wife, who also had direct, face-to-face interactions with Hamade.

The picture of Hamade that emerged from these interviews is of a violent criminal who derives his income exclusively from crime and who specializes in the unbridled intimidation of others in a country in which Hamade appears to operate with impunity.

These witnesses reported that Hamade holds himself out as a member of the RSA military (he is, in fact, *not* a member of the RSA military), that he regularly wears military uniforms, and that he always conspicuously carries a gun. Hamade claims to be descended from Lebanese Royalty (hence, "Prince" Sam). The witnesses reported that Hamade catalyzes his intimidating personal aura through the ostentatious display of the trappings of wealth, including high-end sports cars, a large home in the Kempton Park neighborhood

3

of Johannesburg, and expensive jewelry. None of the witnesses reported that Hamade has, or ever has had, a job.

Indeed, these witnesses reported that Hamade brags about being an outlaw. Hamade bragged in Chris Neveling's presence about murdering his gardener for stealing one of Hamade's Rolex wristwatches (and cutting off the arm on which the gardener was found wearing the stolen watch). Hamade bragged to Eric Hoover that he was under investigation in the RSA for gun smuggling. Neveling reported that Hamade did not buy his house in Kempton Park, but rather simply extorted the house from the former boyfriend of Madelein O'Callaghan in early 2010 through threats and intimidation. Hamade then proceeded to use his unofficial connections with the RSA armed forces to stage a military parade through his new neighborhood.

Hamade copiously threatens those who do not bend to his will. Hamade often directs his threats against the children of the person Hamade seeks to intimidate. When Hamade's business relationship with Neveling became fraught, Hamade threatened to murder Neveling's family and to arrange to have others rape Neveling's daughter while Neveling looked on. These threats drove Neveling's entire family out of the RSA (in October 2011) to permanent exile in the United Kingdom.

At the evidentiary hearing, the government will offer extrinsic evidence corroborating the witness's accounts that Hamade achieves his criminal objectives through intimidation, violence and bling. For example, the government will offer video-recorded Skype calls with an undercover United States special agent in which Hamade threatens to

4

kill Neveling, brandishes a large pistol, and brags about being untouchable in the RSA. The government will offer an assortment of other extrinsic evidence, including photographs and videos from Hamade's FaceBook page, and consensually monitored conversations between Hamade and Neveling, that corroborate Hamade's use overt criminality, intimidation and glittering wealth, to force people into line with his wishes.

Further, the government will offer evidence at the hearing that appears to corroborate the witness's accounts that the defendant does not and never has had any legitimate employment in South Africa. Hamade claims that his business, "New Sam's Palace," is a legitimate truck-leasing business, but the government's investigation, based upon witness interviews, as well as bank records and incorporation records obtained from the RSA, belies this claim. The government will offer these records at the hearing. The evidence will show that Hamade derived his wealth criminally by skimming funds provided to him to buy materiel for Hizballah. Hamade *makes his living* by willfully violating the laws of the United States and the many other countries that consider Hizballah to be a terrorist organization.

B. The Nature and Circumstances of the Offense.

Both Usama Hamade and Issam Hamade claim that the materiel they procured in this case went not to Hizballah but rather the Syrian regime of Bashar al-Assad. The government did not seek to correct the record in connection with Issam Hamade's sentencing because he was a minor participant in the scheme. However, the defendant now before the Court was the kinetic, driving force behind the procurement conspiracy,

5

and Section 3553(a) demands that the government present the fruits of its investigation that show that Hizballah was its beneficiary.

<u>The Nature of Hizballah</u>.   As the Court is aware, Hizballah is an extremely dangerous organization which has been designated by the United States State Department as a "designated foreign terrorist organization" since 1997. To be designated a "foreign terrorist organization," the United States Secretary of State is required to find that the organization (1) is foreign, (2) engages in terrorist activity or terrorism, or retains the capability and intent to engage in terrorist activity or terrorism, and (3) the organization's terrorist activity or terrorism threaten the security of U.S. nationals or the national security of the United States.   8 U.S.C. § 1189. In addition, its senior leadership, including General Secretary Hassan Nasrallah, has been classified since 2001 by the Office of Foreign Asset Control ("OFAC"), an agency of the United States Department of the Treasury, as "Specially Designated Global Terrorists," pursuant to Executive Order 13224, which followed a finding that he had committed acts of terrorism.

Hizballah, founded in 1982, and its primary state sponsor, Iran, have earned well their terrorist labels. Iran's theocracy, the same theocracy which captured and held as hostage 59 Americans at the American Embassy in Tehran in 1979, provides $700 million annually to fund the operations of Hizballah. Iran's commitment to terrorist activity is well documented in open source materials. Hizballah, itself, showed its hostility to "infidel nations" almost immediately after its founding by blowing up the U.S. Embassy in Lebanon on April 18, 1983, killing 63 people, and by bombing the U.S. Marine Corps and French

6

army barracks in Beirut on October 29, 1983, killing 241 American Marines and 58 French soldiers. Hizballah has recently been directly and substantially involved in fighting for the Assad regime in Syria, and in supporting Houthi militants in Yemen.

In summary, Hizballah is an enemy of the United States and Israel, and the defendant's repeated acts of reaching into the United States to provide it with military items was an egregious act that, alone, supports the government's motion for upward variance. But if, as the defendant claims, the items procured for Hizballah were shipped onward to Bashar al-Assad's regime, that would be an additional, aggravating factor under Section 3553(a) because the Assad regime has brutally murdered so many of its own people.

<u>The Evidence Pointing to Hizballah</u>.   The government will present four types of evidence at the sentencing hearing that will show that Hamade committed the offense of conviction to support the FTO Hizballah.

First, the government will show that Hamade had a self-declared motive to support Hizballah in its opposition to Israel, and that Hamade specifically told Neveling that he was a member of Hizballah.

Second, the government will show that the items procured from the United States in this case went to Beirut, not Damascus.

Third, the government will show that the items that went to Beirut were sent there for the benefit of Hizballah to support its military capabilities, including its Un-crewed Aerial Vehicle program.

7

Finally, the government will show that Ayman Ibrahim, sanctioned by OFAC in 2014 for being part of a procurement network for Hizballah, was involved in transshipping one of the jet engines procured in this case to Lebanon.

The Motive Evidence. The government's motive evidence is contained in the undercover Skype recordings, and in consensually-monitored calls between the defendant and Chris Neveling. In his calls with Neveling, the defendant expresses his disgust with the conduct of the United States in the Middle East. In his Skype calls with the undercover agent, the defendant expresses an ardent desire to help "his people" against the depredations of Israel, and says that he will provide that help proudly, even if it means being labeled as a terrorist (a label he says he would wear like a medal). The defendant tells the undercover agent that the Mossad, Israel's security agency, would assassinate him if it knew what he was doing.

The Evidence that the U.S.-Sourced Items Went to Lebanon. The government will prove that the materiel in fact went to Lebanon through two specific examples.

First, the government will introduce evidence regarding how Chris Neveling, at the defendant's direction and with United States currency provided by the defendant, purchased a TRS-18 jet engine in Indiana, and shipped it to SAB Aerospace in the United Arab Emirates (the "UAE"), defendant Berro's company. The government will then present Air Waybills obtained from SAB Aerospace that demonstrate that Berro almost immediately shipped the engine onward to Lebanon.

8

Second, the government will introduce evidence that the MMQG inertial measurement units obtained by Neveling from Systron Donner in California were delivered to the defendant in South Africa in November 2009, who then immediately flew to Beirut to deliver them to his co-conspirators there.

<u>The Evidence that the Material was Procured for Hizballah</u>.

In August 2010, Chris Neveling and his wife Gaynor travelled with Hamade from the RSA to Lebanon. In Lebanon, Neveling met Berro, who thanked Neveling for obtaining the TRS-18 jet engine from Indiana. Berro sought Neveling's assistance in obtaining an attack drone called the "Seraph" from a South African defense contractor. Hamade told Neveling that Hamade and Berro were part of the same organization – the "people," or, as Neveling remembered it, "esballah." Hamade told Neveling that the leader of the "people" was a bearded man whose picture hung in Hamade's Beirut flat and in Hamade's RSA home. Neveling identified that bearded man from a photo lineup as Hassan Nasrallah, the General Secretary of Hizballah. That photo lineup will be offered at the evidentiary hearing.

In addition, the government will present evidence that Neveling procured another TRS-18 jet engine from a vendor in the United Kingdom in 2011 (again at the defendant's direction, and again with funds provided by the defendant); that Neveling shipped the engine to SAB Aerospace; and that SAB Aerospace worked with a man named Issam Ahmaz to ship the engine to Lebanon. Ahmaz has been publicly identified (and designated as a terrorist) by OFAC as a procurement agent for Hizballah.

9

## CONCLUSION

After the evidentiary hearing, and for the reasons, among others, stated above, the government will respectfully request the Court to sentence the defendant to the custody of the Bureau of prisons for 60 months.

Date: July 8, 2020				ERICA H. MACDONALD
						United States Attorney


						By: *s/David J. MacLaughlin*
						DAVID J. MACLAUGHLIN
						JOHN DOCHERTY
						Assistant U.S. Attorneys