UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No. 15-237 (JRT/BRT) |
| | ) | |
| v.                    Plaintiff, | ) | |
| | ) | **DEFENDANT'S POSITION WITH** |
| USAMA DARWICH HAMADE, | ) | **RESPECT TO SENTENCING** |
| | ) | |
| Defendant. | ) | |
| | ) | |

### INTRODUCTION

*"I want the Judge to know I'm very sorry about what happened. I never tried to hurt anyone. I worked for 35 years, just trying to make money. I'm getting old now and just want to be with my family. I hope the Judge will look at my whole story in a positive way and send me to my family. That is what I want the Judge to know."*

This is how Usama "Prince Sam" Hamade answered when his presentence interviewer asked him, at the end of his interview, if there was anything else he wanted the Judge to know for sentencing. But there is more to Mr. Hamade's story than contrition. Mr. Hamade is a gregarious, generous patriarch, who cares deeply for his family and worked extremely hard to keep them safe and secure through a dangerous time in Johannesburg. The better part of his life was dedicated to providing for his family as he served in the Lebanese Army, before moving to South Africa in 1996, with his mind set on starting his own venture—New Sam's Palace, which he envisioned being an entertainment complex to rival any in Johannesburg.

Mr. Hamade started his business, and it was quite successful. He opened "Schizophrenic Night Club" in the late 1990's, which was trendy, popular, and lucrative.

The problem, though, is that like so many businesses, running it well required Mr. Hamade's presence. And Mr. Hamade's presence meant that he was always around the party, and always a center of attention. This is when he started drinking in excess.

For the better part of the next twenty years, alcohol was a constant in Mr. Hamade's life. He started the day with a brandy and juice, kept drinking through his days, and got more serious about it at night. Every day, Mr. Hamade drank. He functioned fine in his business and personal lives, but also displayed poor judgment at times. Relevant to this case, one of those times was when in the late 2000's, he was introduced to members of the Syrian government, who sought to use Mr. Hamade's company and connections to procure aviation parts. Mr. Hamade did not know what those parts would be used for, and he did not care:  more important to him was that he would be paid a massive premium for procuring the parts—money that Mr. Hamade could use to supplement his business revenue and provide for his family.

In early 2018, Mr. Hamade's world came crashing down in a very sobering way. He was arrested on February 13, removed from the home where he cared for and provided for his six children. For the better part of the next two years, Mr. Hamade lived in squalid conditions in a South African jail, until he was extradited to the United States in October of 2019. Once here, he sought to resolve his case as quickly as possible, eventually resulting in the plea which brings him before the Court. Despite his desire for a speedy resolution, Mr. Hamade has been in custody for nearly two and a half years.

Mr. Hamade remains gregarious, and he remains a generous person. But he is broken by what has happened to him. He was the primary provider for his six children,

including a special needs child. They have been without his emotional and financial support. While they struggle to get by, Mr. Hamade has been rendered powerless by his circumstances, unable to support them as he has through his life. He has suffered a good deal. And he has suffered enough.

Reuniting Mr. Hamade with his family through a sentence of time served is an appropriate resolution. He has none of the hallmarks that would call for a longer term: at 56 years old, he has no criminal history (and is in a demographic category of offenders who statistically are unlikely to reoffend); his conduct, while criminal, was not directed toward violent aims; and similar offenders have received sentences at or below his own request of a time-served disposition. Further, Mr. Hamade has been punished very significantly. His legitimate business is in ruins, and his family is liquidating the estate just to get by. For almost three years, the anguish that Mr. Hamade has caused his family has kept him awake through the night, all from poor choices made many years ago. Mr. Hamade is asking the Court to vary from his Guidelines range of 46-57 months, to sentence him to time served (the equivalent of nearly 34 months with good time), and allow him to return home to his family, now a sober man, so that he can provide for them once again.

## BACKGROUND

### *Usama Hamade's Early Life in Lebanon*

Before he was Prince Sam, Mr. Hamade was just Usama, the middle child of Zahar and Darwich Hamade. He was born and raised in Beirut. For most of his youth, Lebanon was enmeshed in its civil war. This exposed a young Usama to graphic violence at a very young age. He recalls driving down the street in his parents' car, seeing someone being

skinned alive, and witnessing people being pulled behind horse drawn wagons. He knew, though, that to dare try to stop the violence would lead to his own undoing.

Usama did not just intuit that trying to stop violence could be dangerous; he knew it from his own family life. Usama adored his mother, who he described as the "best mother ever" in his presentence interview. Anything she could give her children, according to Mr. Hamade, she did. She filled the home with love, and nurtured Usama along with his siblings. But Mr. Hamade's father was a stark contrast from Zahar. Growing up, Mr. Hamade recounted, "no two days would pass without him beating someone." The target of Darwich's aggression was either Usama, Issam, or Zahar; sometimes, all three. Usually these beatings would occur with a metal stick that would leave the victim bloodied and bruised. Darwich's violence was so prolific that Usama and Issam had very few friends as children—everyone was afraid of Darwich. At least, though, he had his mother.

When Mr. Hamade was 14 years old, though, even the solace of his mother was taken from him. His parents had always been at odds due to his father's uncontrolled aggression. Now, they had decided to divorce. Where this could have granted Mr. Hamade respite from his father's violence, it ended up just the opposite:   Zahar was forced to move back in with her own parents, and Darwich retained full custody of the children. Darwich would not allow Mr. Hamade to have any contact with his mother. Mr. Hamade secretly saw with his mother as much as he could by sneaking over to a neighbor's house to visit her, but this only amounted to a couple of times a month.

For the rest of his adolescence, Mr. Hamade was confined to his father's house, still one of the principal subjects of his daily abuse. Beatings were his life, day in and day out,

until he became an adult. At that time, he enrolled in a military academy, and then soon joined the Lebanese Army. He remained a member of the Lebanese Army from 1984-1990, serving in active combat situations for his country. He suffered two separate artillery injuries, first from a single gunshot, then from a series of gunshots and grenade shrapnel. This latter event caused him to leave the military with an honorable discharge, having attained the rank of Sergeant Major.

***1990-2018:   Building a Life in South Africa***

After his honorable discharge from the military, Mr. Hamade needed to find employment for himself. In 1985, Mr. Hamade had married his first wife, Miram Kirbit, and by 1990 they had two children, Miriana and Ali, that Mr. Hamade needed to provide for. This picture, taken circa 1991, shows a young Mr. Hamade with his beloved children, Miriana and Ali, along with the family dog:



Mr. Hamade had received a master's degree in public relations during his period of

military service, but in 1990 Lebanon was still in wartime strife, and had no need for

someone with a graduate degree in public relations. So for the next few years, Mr. Hamade

moved around to where he could find work to support his family. This led him first to

Guinea in 1990, where he worked as a supervisor in a clothing factory. In 1992, Mr.

Hamade's employer transferred him to Nigeria. While there, Mr. Hamade was befriended

by fellow Lebanese expatriates who had a company in Congo, and a need for a mechanical engineer. Mr. Hamade had some familiarity with engineering from school and his military training, so he moved to Congo for this position from 1993 through 1995.

During this same time, Mr. Hamade's marriage to Miram became difficult. Mr. Hamade identifies as Shia, and Miram is Sunni. For several years they worked through their differences, but by 1994 they could no longer reconcile, and divorced. By this time, they had a third child, Diana. When the couple divorced, Mr. Hamade became the sole caretaker of his three children.

Around 1995, Mr. Hamade married Nicole Massiyo, and soon after they had a daughter, Zahra. Around this same time, the family moved to South Africa, which felt like home to Mr. Hamade. His relationship with Nicole faltered, and the two divorced in 1997. Mr. Hamade and Ms. Massiyo coparented for some time, but by 2001, Zahra was living full-time with Mr. Hamade, Miriana, Ali, and Diana at Mr. Hamade's home in South Africa. By 2001, Mr. Hamade had again expanded his family, adding his son Issam in 1999 though his marriage to Hanna Pretorius. Mr. Hamade's final child, Sam, was born in 2002 to his marriage to Lourine Van Rooyan.

At all times, all of Mr. Hamade's children lived with him at his home. He was their sole provider. Mr. Hamade's children, pictured below, remain the most important part of his life. As is clear from the letter of support provided by Mr. Hamade's eldest daughter on behalf of the family, he is the most important part of their lives, too.



Raising this family was not at all easy. There were several mouths to feed, and lots of support was needed. Mr. Hamade not only cared for his own children, but also opened his home to others. Around the time Mariana was 15 years old, she and Mr. Hamade came to know a similarly-aged girl, Tamara Stanfield, who was drug addicted and had nowhere to live. Mr. Hamade took her into his home, raised her as his own child, and helped her become sober. He helped Ms. Stanfield not for any return. He helped her because she needed it.

With so many children living with Mr. Hamade, caretaking was an enormous task. This was especially true for Ali, who, despite now being over 30 years old, is developmentally a child. He has serious mental challenges which have been with him since

8

he was 3 years old, and will be with him for the rest of his life. Mr. Hamade attended to Ali's needs. With Mr. Hamade gone, Ali is suffering increasingly from panic attacks, asking his sisters about his dad's whereabouts and when he will be coming home. Ali needs Mr. Hamade back.

Raising all of Mr. Hamade's children was financially and emotionally taxing. From a financial perspective, Mr. Hamade decided to start his own business, incorporating as "New Sam's Palace." He started his venture by running an entertainment complex called "Schizophrenic Night Club." This was a very successful and popular establishment. But, as Mr. Hamade learned, running a bar has its perils:  as the owner, the party is always around you, as you have easy access to as much alcohol as you want in an environment where revelry is the whole point. But where club goers might engage in this behavior once in a while, for Mr. Hamade, the owner, it was every night. What started as a painless and easy escape from the challenges of home life soon became a bigger problem. By his mid-thirties, Mr. Hamade was an alcoholic, drinking every day, all day. He would drink brandy and juice in the morning, continue through the afternoon, and then move to different spirits through the night.

Mr. Hamade moved away from his nightclub, turning New Sam's Palace into a transport company that rented trucks and busses. But the drinking did not stop, even once the club was gone. In his mind, it was easy to justify. After all, it was hard to raise his children, and working all the time made it all the more difficult. Drinking took the edge off. And since he usually drank at home, alone, he felt there was no real harm. But it

9

impaired his judgment, as he can now see, leading him to make risky and ill-advised decisions that eventually led to his current state of demise.

*Life in Johannesburg: A Violent and Dangerous Place*

Mr. Hamade agrees with the government that his life in South Africa was surrounded by violence. According to Numbeo's 2020 Crime Index, a crowd-sourced global database, South Africa is one of the most dangerous regions in the world, with a crime index of 77.49 out of 100 and a low safety rating of 22.51 out of 100.[1] Contextually, this makes South Africa the third most dangerous country in the world, behind Venezuela and Papua New Guinea.[2] Johannesburg, where Mr. Hamade lived, is one of the cities that contributes to these ratings. Despite being the economic hub of the country, the city ranks among the world's ten most dangerous cities.[3]

The way in which crime operates in Johannesburg is unique. Rather than the close-knit and familial criminal groups found in many urban cities, Johannesburg's inner-city is notorious for an individualistic approach to crime.[4] People work together solely for profit, and efficiency is prioritized over building trust, furthering the incentive for criminals to resort to violence to get the job done.[5] The exception to this idea is lower-level criminal groups, which are locally based. These groups are most commonly involved in muggings,

---

[1] *Joburg ranked among 10 most dangerous cities in the world,* IOL, *available at* *https://www.iol.co.za/saturday-star/joburg-ranked-among-10-most-dangerous-cities-in-the-world-48011070.*
[2] *Id.*
[3] *Id.*
[4] *Falling down the Rabbit Hole: Crime in Johannesburg's Inner City*, Kirsten Harrison, Taylor & Francis Group, *available through JSTOR.*
[5] *Id.*

theft of electronics, and burglaries.[6]

These factors work together to not only foster the aforementioned high rates of crime, but a fear of crime among residents, especially in Johannesburg. One way in which the fear of crime has been manifested is extensive road closures.[7] Particularly in affluent suburbs, such as where Mr. Hamade lived, the urban landscape is dominated by road closures because they mimic security villages that are typically guarded by private security concerns.[8] The necessity of these security villages stems from broad distrust of the local government by residents to keep them safe.[9] In addition to the role of road closures, fear of crime is also heightened for those who have less job security, for crime further strains business growth at the local level.[10] In a 1998 World Bank study, 83% of Johannesburg businesses were subject to crime, and over 60% of those businesses experienced break-ins.[11]

As a successful business owner, Mr. Hamade was not immune to the economic impact of crime in the city. After living in South Africa for decades, Mr. Hamade has learned to live with the fact that most of the public security and law enforcement in the area are the same people who rob private citizens, highlighting the inherent necessity of self-protection. So, the government is correct when it claims Mr. Hamade carried a firearm

---

[6] *Id.*

[7] *The fear of others: Responses to crime and urban transformation in Johannesburg*, Teresa Dirsuweit, WITS University Press, *available through JSTOR.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Johannesburg: Fearful City?*, Teresa Dirsuweit, *available through Academic Search Complete.*

for protection. As often as he could, he also traveled with private security guards to ensure his own safety. Mr. Hamade's use of private security guards when exiting his house is far from uncommon. Security companies have received enough popularity to be listed on the Johannesburg Stock Exchange, and approximately 125,000 people were employed as security guards in the city in 1999.[12]

Likewise, in light of the high crime rate, firearm possession has become ubiquitous in South Africa. There are currently around 4.5 million licensed guns in the country.[13] But this figure only scratches the surface of the true universality of the nation's firearms. A collection of global data from the Small Arms Survey in 2018 found that in South Africa, 2.35 million firearms are unregistered.[14] In comparison, there were 250,481 firearms registered to law enforcement and 350,636 total military firearms. Ultimately, these numbers are reflective of the community's response to crime and the egregious inefficiency of law enforcement. Mr. Hamade's decision to be armed and accompanied by security when leaving the house was not taken on a whim. He made calculated choices in an effort to protect himself and his family.

**Mr. Hamade's Life Since His Arrest**

On February 13, 2018, Mr. Hamade was arrested in South Africa to be held on this

---

[12] *Johannesburg: Fearful City?*, Teresa Dirsuweit, *available through Academic Search Complete*.
[13] *A Snapshot of Gun Violence in South Africa*, Gun Free South Africa, *available at* https://www.gfsa.org.za/.
[14] *Here's how many South Africans own a gun*, BusinessTech, *available at* https://businesstech.co.za/news/lifestyle/252713/heres-how-many-south-africans-own-a-gun/.

case. The arrest came years after the original, August 19, 2015 indictment. (Doc. 1.) For the next 20 months, Mr. Hamade was held in the Modderbee Correctional Facility in South Africa, awaiting extradition to the United States.

Mr. Hamade's time in South African jail was far from a relaxed form of detention. Prisons in the nation suffer from a host of problems and numerous human rights abuses, incentivizing forms of corruption among inmates and guards to obtain necessary resources. One of the most pervasive problems is overcrowding. Many cells house two to three times as many inmates as they were originally designed to hold, and the average prison density is 135%.[15] Data from March 2017 revealed that South African jails had 119,134 beds available for an average inmate population of 160,280.[16] Even single cells meant for special cases often hold two or three inmates.[17] Many prisoners also have to share a mattress or sleep on the floor due to a lack of space.[18] Overcrowding rates are the highest in urban areas like Johannesburg.[19] Modderbee Correctional Facility, the jail where Mr. Hamade was held (on the outskirts of Johannesburg), has an overcrowding rate of 35%.[20]

---

[15] *Prisons in South Africa,* Derrick Thulani and Sasha Gear, Prison Insider, *available at* https://www.prison-insider.com/countryprofile/prisonsinsouthafrica#introduction-5d00f804351ce.

[16] *Factsheet: The state of South Africa's prisons*, Gopolang Makou, Ina Skosana, and Ruth Hopkins, Africa Check, *available at* https://africacheck.org/factsheets/factsheet-the-state-of-south-africas-prisons/.

[17] *Prisons in South Africa,* Derrick Thulani and Sasha Gear, Prison Insider, *available at* https://www.prison-insider.com/countryprofile/prisonsinsouthafrica#introduction-5d00f804351ce.

[18] *Id.*

[19] *Factsheet: The state of South Africa's prisons*, Gopolang Makou, Ina Skosana, and Ruth Hopkins, Africa Check, *available at* https://africacheck.org/factsheets/factsheet-the-state-of-south-africas-prisons/.

[20] *Modderbee Correctional Facility at 35 percent overcrowding*, Siphokazi Zama, Springs

The significance of overcrowding in one's daily life in the jail can also be seen from the viewpoint of security personnel and staff members. Absenteeism rates for staff are extremely high because the overcrowded units cause workers to be stretched thin.[21] This leads to exhaustion and disillusionment among workers, making it all the more difficult for them to provide essential services for prisoners.[22]

Part and parcel with the issue of overcrowding are numerous health problems and a lack of medical attention given to inmates who are ill.[23] Tuberculosis and HIV/AIDS are the most common causes of death in South African prisons, largely due to the inaccessible nature of medical services.[24] Part of the reason health concerns are so rampant is unsanitary living conditions. Bedding is not washed, causing lice, rashes, and scabies.[25] This aligns with Mr. Hamade's experience—he recounts that prison life in South Africa was unsanitary, infested, and inhumane. There is no access to hot water, and plumbing conditions are unclean if they even exist.[26] Several inmates, including Mr. Hamade, are forced to take cold showers even when temperatures were below zero. Insects and rodents were everpresent on cell floors. Healthcare provided to those who fall sick fails to meet basic standards. Many medical facilities have no beds, prescribed medications have

---

Advertiser, *available at https://springsadvertiser.co.za/191452/modderbee-correctional-facility-at-35-per-cent-overcrowding/*

[21] *Prisons in South Africa,* Derrick Thulani and Sasha Gear, Prison Insider, *available at https://www.prison-insider.com/countryprofile/prisonsinsouthafrica#introduction-5d00f804351ce*.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

delayed arrival, and over-the-counter medications are often out of stock.[27] Mr. Hamade noted that sick inmates were often beaten by wardens rather than adequately taken care of. Not only are physical health issues ignored, but there are no resources put toward mental health. An example of this can be found in prisons' approaches to suicides; only prisoners who have *already* attempted suicide are put under a special watch, regardless of any conversations they have had with prison staff regarding their ideation.[28]

Minimal exposure to other resources exists in South African prisons. Only a very small percentage of inmates receive access to library facilities, outdoor recreation, or educational materials.[29] During Mr. Hamade's time in jail, he was stuck inside with no air conditioning, even on the hottest days. The food provided by the country's jails is far from adequate as well. In 2015, the Judicial Inspectorate of Correctional Services (JICS) filed a report regarding the rotten food, insufficient quantities in meals, and a lack of accommodation for allergies and religious beliefs in prisons.[30]

Ultimately, this all highlights the fundamental lack of human rights protections found in South African prisons. Wardens are generally of the opinion that inmates are in prison *for* punishment, rather than *as* punishment.[31] In 2015, more than 3,150 prisoners stated that they had been assaulted by officials, and, in 2015, the JICS recorded 34,000

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Assessing the State of South Africa's Prisons*, Lukas Muntingh, *available on ResearchGate*.

complaints regarding poor conditions in detention.[32] While federal detainees sometimes complain about their conditions while housed in local custody, those conditions do not compare whatsoever to the squalor of South African jails. That was Mr. Hamade's experience for 20 months, before he was extradited to the United States.

During the time Mr. Hamade has been in custody, his entire world has collapsed. He is a true fount to his family. By the time of his arrest, his home included his children and grandchildren. He provided for them. Now, they have nothing. New Sam's Palace has no assets—with Mr. Hamade gone, many of his trucks and busses have been stolen. The business also legally unwinding, as it is in the process of deregistering. Meanwhile, Mr. Hamade's personal assets are being sold, one by one, by Mr. Hamade's family to pay for their ongoing living expenses. The financial and emotional toll of Mr. Hamade's absence is growing on him, and on his family. His mental health is suffering, as noted in the Presentence Report, and his family is suffering too, as the Court can observe through Mariana's letter, written on behalf of the family. For a businessperson, and a patriarch to have lost his life's work and be powerless to cure his family's misery is true anguish. Yet, that has been Mr. Hamade's life for 29 months now.

## DISCUSSION

Although the parties disagree on certain areas of the presentence report none of those controversies affect the advisory Guidelines range of 46-57 months. Below, Mr. Hamade briefly recounts the matters in dispute, then follows with an analysis of what

---

[32] *Id.*

sentence will appropriately honor the sentencing tenets laid out in 18 U.S.C. § 3553(a). That sentence will be one of time served, so that Mr. Hamade may leave the country as promptly as possible and return to his family in South Africa.

## I.      Areas of Dispute Within the PSR.

As a general matter, Usama Hamade has objected to all references to him working for or on behalf of Lebanon or "Hizballah." The government persists in the notion that this case is about Hezbollah, but that notion is wrong and unsupported—just as it was when the government made such claims with respect to codefendant Issam Hamade. Usama Hamade pleaded guilty to conduct involving Syria. References to Lebanon and Hizballah should be removed from PSR paragraphs 16, 17, 19 (indicating transshipment to Lebanon), 21 (indicating couriering to Lebanon and delivery to Hizballah), and 23.

Paragraph 28 merits special attention. The statement that Sony binoculars were delivered to or for the benefit of Hizballah is wrong. These binoculars were delivered to Midhat Hmayed, who is a General in the Lebanese Army and not someone affiliated with a terrorist organization. The government knows this, too, since this information comes directly from Special Agent Warfield's FD-302 Interview of Alin Hamade, the person who delivered the binoculars. All language from "Investigative materials indicate" through the remainder of this paragraph should be removed.

Mr. Hamade further objects to the inclusion of the statements set forth in paragraphs 33-35, as well as the title "Threats and Recorded Calls," which does not accurately reflect the content of those paragraphs. More specifically, with respect to paragraph 33, this entire paragraph is inaccurate:  Mr. Hamade did not steal binoculars, nor did he threaten to harm

Mr. Neveling or his family. Mr. Neveling had stolen nearly $40,000 from Mr. Hamade and had active international warrants after he fled South Africa.

With respect to paragraph 34, the paragraph as written misrepresents the facts. There were actually two Skype video calls between Mr. Hamade and the government's undercover agent. Each of the calls referenced in this paragraph is over 40 minutes long.[33] During the first, Mr. Hamade expressed disgust about Mr. Neveling stealing tens of thousands of dollars from him, telling the agent that he would have gladly just given Mr. Neveling the money if he asked. Mr. Hamade also explained this is not the first time he had been the victim of theft, describing that an exotic car company recently took his money without providing services. Mr. Hamade then explained he is suing this fraudster, making clear that he resorts to litigation and not strong arm tactics. In the following call, months later, Mr. Hamade told the undercover agent that Mr. Neveling is a "good guy" and a "good person," and "I'm not interested about him, I want my money back and that's it." These statements are found between the 4 and 8 minute marks of the second Skype recording. Finally, Mr. Hamade knows of no evidence that he seriously threatened to kill a United States government official.

Paragraph 35 is also inaccurate and misleading to the extent it indicates Mr. Hamade harbored some type of animosity toward the United States by saying he would never meet with government agents. Mr. Hamade *did* meet with United States government officials of his own accord on April 13, 2015. He was pleasant throughout that meeting. It is not clear

---

[33] These recordings will be provided to the Court on disc in advance of Mr. Hamade's sentencing hearing.

why the PSR indicates Mr. Hamade said he would not receive government agents, but withholds the more important information—that he actually *did* meet with government agents. Once that statement is removed, all that remains of paragraph 35 is crass language and a statement about foreign policy. That does not merit inclusion in a PSR.

Finally, the enhancement contemplated (but rejected) in paragraph 40 of the PSR appears to be based on the inaccuracies in paragraphs 33-35 that are mentioned above. As such, Mr. Hamade objects to the PSR including any statement indicating that an obstruction of justice enhancement was considered.

## II.   Mr. Hamade's Circumstances Merit a Sentence of Time Served.

As noted above, the parties agree that with a Criminal History Category of I and an adjusted offense level of 23, Mr. Hamade would has an advisory Guidelines range of 46-57 months' imprisonment. But, as has been the case for well over a decade now, that range is just that—a guideline for sentencing courts to reference in crafting an appropriate sentence. *United States v. Booker*, 543 U.S. 220, 259-60 (2005).

Since Booker, the Supreme Court has underscored the limited role the guidelines ought to play in sentencing a defendant. They carry no presumption of reasonableness for a sentencing court. *Nelson v. United States*, 555 U.S. 350, 351 (2009) (per curiam). Sentencing courts may vary from the guidelines based on considerations as provocative as simply disagreeing with the guidelines' treatment of an offense. *See, e.g., Kimbrough v. United States*, 552 U.S. 85, 110-11 (2007). And variances from the guidelines do not need to be accompanied by "extraordinary" circumstances. *Gall v. United States*, 552 U.S. 38, 47 (2007). The ultimate sentencing touchstone is not the guidelines, but rather 18 U.S.C. §

3553(a), which directs a court to impose a sentence "not greater than necessary" to honor the factors enumerated in that section. *See, e.g., United States v. Huff*, 514 F.3d 818, 820 (8th Cir. 2008) ("[A] district court's job is not to impose a 'reasonable' sentence. Rather, a district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)(2)." (citation omitted)). This is an inherently individualized and restrictive inquiry, since the primary enumerated goal of § 3553(a) is sentencing restraint. *Gall*, 552 U.S. 49-50. Cast in that light, it is clear that for Mr. Hamade a sentence within his guidelines range would be greater than necessary to accomplish the sentencing goals set forth in § 3553(a).

## A.      The Nature and Circumstances of the Offense

On May 18, 2020, Mr. Hamade appeared before the Court and pled guilty to one count of Conspiracy, in violation of 18 U.S.C. § 371. (Doc. 201.) That offense carries a five-year statutory maximum sentence.

Mr. Hamade's testimony regarding the factual basis for the guilty plea tracked his Plea Agreement. In that agreement, Mr. Hamade indicated that in 2009, he met with persons claiming to be acting on behalf of the government of Syria. (Doc. 202, ¶ 2(a).) In the years following that meeting, Mr. Hamade arranged for the purchase of aviation parts which were ultimately sent to "the government of Syria." (Doc. 202, ¶ 2(d).) Because such parts could not legally be shipped to Syria without certain authorizations, Mr. Hamade's conduct violated the laws of the United States by subverting that law.

In the Plea Agreement, the government agreed that the above facts "establish an adequate factual basis for the defendant's plea." (Doc. 202, ¶ 2.) Yet in its sentencing

position paper, the government inexplicably clings to the notion that this case is all about Lebanon, terrorism, and Mr. Hamade's support of "Hizballah." Simply put, that is wrong. Hezbollah, or, translated, "Party of God," is rooted in the adherence to strict tenets of Muslim faith. That, of course, includes abstinence from alcohol. Yet during the period of offense conduct, alcohol and intoxication were daily fixtures in Mr. Hamade's life. The incongruence has an easy explanation:   Mr. Hamade was not a supporter of, or working on behalf of, Hezbollah. If so, he would say so, since it would have no adverse impact on his Guidelines calculations.

Mr. Hamade procured parts on behalf of the government of Syria. He knew it was wrong when he did it. As he said in his PSR:

*I, Usama Hamade, accept full responsibility for my offense. This happened during a difficult time in my life, where my judgment was clouded by drinking too much every day. I am sorry to those I have harmed.*

(PSR ¶ 41.) He has accepted full responsibility for his offense.

## B.    Mr. Hamade's History and Characteristics

As stated above, Mr. Hamade is a former member of the Lebanese Army, serving honorably until his medical discharge. He is a loving, supportive patriarch. He worked his entire life to create a business that would provide a safe, stable, nurturing environment for his family. He succeeded, but during his journey he also became an alcoholic. This cost Mr. Hamade dearly in many ways, most notably that his impaired judgment led him to break the law in his business dealings, as evident from his current circumstances.

21

The government's position pleading attempts to paint Mr. Hamade as a Hezbollah-loving, "violent criminal" whose life is dedicated to "unbridled intimidation of others in a country in which Mr. Hamade appears to operate with impunity." (Doc. 210 at 3.) This is not the first time the government has lashed out against Mr. Hamade with hyperbolic insults. (See, e.g., Doc. 49 at 12 (referring to Mr. Hamade as "a violent, gun-toting thug").) Not surprisingly, most of the government's "evidence" of Mr. Hamade's supposed life of bad deeds comes from the government's star witness, Christian Neveling, and his wife Gaynor. Mr. Neveling and his wife fled South Africa after stealing almost $40,000 from Mr. Hamade. By 2012, Mr. Neveling also had an active INTERPOL "Red Notice" for illegal firearms possession and theft in South Africa. *See* Exhibit 1 at 4. Mr. Neveling was not fleeing Mr. Hamade; he was fleeing his own prosecution.[34]

Mr. Neveling's stories about Mr. Hamade—that he brutally murdered his own gardener and forced Mr. Neveling's whole family to flee South Africa under fear of violence—are spectacular fantasy. Common sense demonstrates this. If Mr. Hamade had *murdered and dismembered* his own gardener, bragging about it to anyone who would listen for years on end, one would reasonably expect the government's extensive investigation into Mr. Hamade to have uncovered *some* evidence of the matter. But there is no such evidence—no South African police investigation, no corroborating witnesses,

---

[34] Mr. Neveling's thievery went beyond Mr. Hamade, too, as Mr. Neveling apparently stole from his own entire family. Shortly after Mr. Neveling stole thousands of dollars from Mr. Hamade, Mr. Hamade received an unsolicited Facebook message from Mr. Neveling's brother Steg. In the message, Mr. Neveling's brother revealed that Mr. Hamade was just the most recent victim of Mr. Neveling, who had "stolen from my parents, myself, and my two sisters." Exhibit 2.

and not an iota of evidence of there is any actual video recording of this make-believe killing. Instead, the government hangs its hat, again, on Mr. Neveling's statement alone.

Additional evidence produced in discovery demonstrates the trouble with placing such heavy reliance on Mr. Neveling. Take Mr. Neveling's claim that he fled South Africa to get away from Mr. Hamade and has hidden out ever since in fear. Separate and apart from the indirect evidence that Mr. Hamade did not force Mr. Neveling into hiding (that is, stealing thousands of dollars and leaving criminal cases in warrant status), Mr. Neveling's *own actions* show he does not fear Mr. Hamade. Mr. Neveling personally contacted Mr. Hamade several times *after* stealing thousands of dollars from him. In February of 2014, Mr. Neveling contacted Mr. Hamade via Facebook Messenger to discuss a recent newspaper article, and to apologize for stealing from him. *See* Exhibit 3. ("I am sorry about the money and am going to make it right eventually.") Given the government's description of Mr. Hamade as a blusterous "thug" who "achieves his criminal objectives through intimidation, violence, and bling," one would reasonably expect Mr. Hamade's response to be intimidating, violent, or "blingy," whatever that may mean. But Mr. Hamade's response was none of these things. Mr. Hamade simply commented back about the article, and that was the end of the conversation. There were no threats, no anger, and no intimidation. Later, in 2015, when the government was using Mr. Neveling as a cooperating witness, he placed a number of recorded calls to Mr. Hamade. *See* Exhibit 4. The purported purpose of these calls was for Mr. Neveling to alert Mr. Hamade about an investigation being conducted by the United States government. During the calls, the two men discuss that subject, but Mr. Hamade expresses no ill will toward Mr. Neveling. There

is no discussion of hurting or killing Mr. Neveling or his loved ones. Rather, almost in passing, Mr. Hamade mentions the debt (not surprising given he was the victim of large-scale theft), but there is no direct or veiled threat to Mr. Neveling.

Taken altogether, the evidence already before the Court shows Mr. Neveling is not a credible witness. He will be no witness at all, it turns out, since the government has indicated it will call its own case agent to testify *about* Mr. Neveling rather than calling Mr. Neveling himself. If the Court allows such testimony, it cannot change the fact that Mr. Neveling has no credibility, even when filtered through a more credible government witness.

Simply put, the government's view of Mr. Hamade is myopic, and wrong. Mr. Hamade is not a member of Hezbollah, and he does not support terrorist activities. He is a good man, who takes care of his family momentously. He has a generous heart, and strong character. He has had transgressions centered around alcohol, poor judgment, and greed, but those transgressions come to this Court a decade old. Today, Mr. Hamade is sober, clear minded, and humbled.

## C.   The Need to Deter Criminal Conduct, Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment

A below-guidelines sentence of time served will honor the sentencing goals of deterrence, just punishment, or respect for the law. A May, 2016 document published by the National Institute of Justice[35] (a division of the Department of Justice), entitled "Five Things About Deterrence," explained that "[s]ending an individual convicted of a crime to

---

[35] *Available at* https://www.ncjrs.gov/pdffiles1/nij/247350.pdf.

prison isn't a very effective way to deter crime. The article stated that "prison sentences, particularly long sentences, are unlikely to deter future crime," and "actually may have the opposite effect." Likewise, the report continues, "[i]ncreasing the severity of punishment does little to deter crime . . . partly because criminals know little about the sanctions for specific crime." This is especially true given the unique facts of this case, which involves a South African citizen who was never before in the United States. The notion that Mr. Hamade must receive a guidelines sentence to deter international society from committing Conspiracy offenses is simply unsupported.

Further, Mr. Hamade's age makes him statistically unlikely to reoffend. Recently, the Sentencing Commission studied offenders for an eight-year period following release from prison and concluded that "[o]lder offenders were substantially less likely than younger offenders to recidivate following release." U.S. Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, at 2 (December 2017).[36] This was by no small margin, either; it was dramatically so:

---

36      Available      at      https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.



*Fig. 1* **Total Arrests by Age**
**All 2016 U.S. Arrests Compared to Recidivism Study Offenders' Arrest Records**

Id. at 11.

"The pattern is consistent across age groups, as age increases recidivism by any measure declined. Older offenders who do recidivate do so later in the follow-up period, do so less frequently, and had less serious recidivism offenses on average." *Id.* at 30. Put simply, the older the offender, the less likely to reoffend.

With respect to just punishment, Mr. Hamade's time in pretrial detention has been long, arduous, and taxing. Lengthy pretrial detention in local custody is challenging, because jails lacks the full facilities and programming of federal prisons. But jail in South Africa is misery. Further time in custody is not necessary to establish a punishment that is just. Justice is honored by a sentence that recognizes the grim custodial sentence Mr. Hamade has already served.

**D.      Further Imprisonment Will Not Provide Mr. Hamade with Needed Medical Care or Correctional Treatment in the Most Effective Manner.**

As noted in the PSR's paragraphs 81-86, Mr. Hamade has significant medical issues. He has blood clots such that he must wear compression socks and take Warfarin. Warfarin has serious side effects including, but not limited to bloody stools, blood in urine, joint pain, vision changes, dizziness or weakness.[37] Mr. Hamade has suffered all of these side effects. Mr. Hamade informed medical staff at the jail he was having memory issues, pain, and blood in his urine and jail records indicate that upon reviewing Mr. Hamade's activities, he was seen holding his leg and crying. It was determined that he needed to be seen at a hospital. Upon returning to the jail, he had to be placed in quarantine which meant he could be out of his small cell for only one hour, preventing him from walking and exercising– two things that ease his leg pain.[38] The reason for his severe pain is that Mr. Hamade has been diagnosed with deep vein thrombosis (DVT) (PSR ¶ 85). DVT causes blood clots to form in major veins inside the body. The clots usually form in the legs and can travel through the bloodstream to lodge in the lungs causing a pulmonary embolism.[39] The Centers for Disease Control and Prevention (CDC) estimates that DVT, together with pulmonary embolism kill approximately 100,000 Americans annually. The CDC has found people are at an increased risk for severe illness from COVID-19 if they have pre-existing diseases such as pulmonary diseases, high blood pressure and heart issues.[40] Mr. Hamade has had heart problems dating back to at least 2014. To further add to his medical aliments,

---

37    https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/in-depth/warfarin-side-effects/art-20047592

38  Medical Records from Sherburne County Jail

39    https://www.mayoclinic.org/diseases-conditions/deep-vein-thrombosis/symptoms-causes/syc-20352557

40  www.cdc.gov (lasted visited July 10, 2020).

his family verified that Mr. Hamade has had strokes and it is noted that he has high blood pressure. (PSR ¶ 84-85). Mr. Hamade's medical reasons alone would support a sentence of time served.

**E.     A Time-Served Sentence Will Not Create Unwarranted Sentencing Disparities.**

On April 27, 2020, this Court sentenced Mr. Hamade's brother and codefendant, Issam, to credit time served. Aside from the Hamade case, this district has seen similar cases. For example, in *United States v. Green Wave Telecommunication*, 15-329 (JNE/KMM), Defendant Ghodskani was sentenced to credit time served after admitting to her role in conspiracy to illegal export technology from the United States to Iran. The government note in their pleading (Doc. 102), that "[t]he United States, among many other countries, have imposed sanctions against Iran based on that country's continued support of international terrorism, as well as its development of a nuclear program." Ghodskani had an advisory guideline range was 46-57 months, the same as Mr. Hamade's, and was sentenced to 27-months. Defendant Jalali admitted to the same facts and the parties agreed to a mitigating role. The court found an advisory range of 37-46 months and sentenced Jalali to 15 months. Around the country, there have been similar cases. Attached to this pleading is a summary of *some* of those cases. *See* Exhibit 5. Mr. Hamade recognizes that every case before the courts may have different factors animating their respective sentences, but it is important to recognize those sentences for defendants with the same conviction as Mr. Hamade. He has been in custody for 29 long months. A sentence of credit

time served is justified and warranted, and is not disparate from similarly-situated defendants.

## CONCLUSION

For the reasons set forth above, Usama Hamade asks this Court to sentence him to time served.


Dated:   July 13, 2020                    Respectfully submitted,


                                          *s/ Douglas L. Micko*
                                          DOUGLAS L. MICKO
                                          Attorney ID No. 299364
                                          MANNY K. ATWAL
                                          Attorney ID No. 282029
                                          Attorneys for Usama Hamade
                                          107 U.S. Courthouse
                                          300 South Fourth Street
                                          Minneapolis, MN 55415